**GUCOVSCHI LAW FIRM, PLLC.**
Adrian Gucovschi (State Bar No. 360988)
Nathaniel Haim Sari (State Bar No. 362634)
165 Broadway, Fl. 23
New York, NY 10006
Telephone: (212) 884-4230
Facsimile: (212) 884-4230
E-Mail: adrian@gucovschilaw.com
nathaniel@gucovschilaw.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

SAMIN SAYAREH, individually and on behalf of all others similarly situated,

Plaintiff,

v.

BLOOM NU LLC,

Defendant.

Case No.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Samin Sayareh ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Bloom Nu LLC ("Defendant"). Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on her personal knowledge.

## NATURE OF THE ACTION

1. Plaintiff brings this class action on behalf of herself and all similarly situated consumers who purchased Bloom Pop prebiotic soda products (collectively, the "Products").[1]

2. In the Products' online marketing, including on Defendant's website and on Amazon.com, Target.com, Walmart.com, and Kroger.com, Defendant prominently represents that the Products contain "No artificial flavors, colors, or preservatives" (the "Representations").[2]

3. Despite those Representations, however, the Products contain manufactured citric acid, an artificial ingredient that functions as a preservative.

4. Accordingly, Plaintiff brings claims against Defendant for violations of (1) California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, et seq.; (2) California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq.; (3) California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, et seq.; (4) Violations of State Consumer Protection Statutes; (5) Breach of Express Warranty; and (6) Unjust Enrichment.

## PARTIES

5. Plaintiff Samin Sayareh is a citizen of California residing in Davis, California. Plaintiff purchased Defendant's Shirley Temple Product for her personal use on or about March 12, 2026 from Defendant's official Amazon listing while residing in Davis, California, for approximately $24.62.[3] Prior to making her purchase, Ms. Sayareh saw and relied on Defendant's

---

[1] The Products include Bloom Pop Shirley Temple, Classic Orange, Peach Pineapple, Raspberry Lemonade, Rocket Blast, Strawberry Cream, the Variety Pack advertised as the Classic Pack, Watermelon Lime, and Winter Pomberry.

[2] The challenged Representations and the product-specific URLs on which they appear are identified with the evidence for Defendant's website, Amazon.com, Target.com, Walmart.com, and Kroger.com below.

[3] Bloom Nutrition Pop Shirley Temple Prebiotic Soda, Amazon.com, https://www.amazon.com/dp/B0FJKN2F76?th=1 (last accessed August 17, 2026).

Representations in the official Amazon listing that the Products contained "No artificial flavors, colors, or preservatives." Based on those Representations, Ms. Sayareh understood the Products to contain no artificial preservatives. Ms. Sayareh relied on the Representations when she decided to purchase the Product. Accordingly, the Representations were part of the basis of her bargain, in that Ms. Sayareh would not have purchased the Product on the same terms had she known that the Representations were untrue. Furthermore, in making her purchase, Ms. Sayareh paid a price premium due to Defendant's false and misleading Representations. Ms. Sayareh, however, did not receive the benefit of the bargain because the Product did, in fact, contain an artificial preservative—manufactured citric acid. Had Ms. Sayareh known that Defendant's Representations were false and misleading, she would not have purchased the Product or would have paid substantially less for it.

6. Ms. Sayareh continues to purchase prebiotic sodas and remains interested in purchasing prebiotic sodas that genuinely contain no artificial preservatives, including Defendant's Products. She would purchase the Products again if she could be confident that the Representations were truthful. As matters stand, however, she cannot determine whether Defendant's online marketing has been or will be corrected, and she is therefore unable to rely on Defendant's Representations when deciding whether to purchase the Products in the future.

7. Defendant Bloom Nu LLC is a Delaware limited liability company with its principal place of business at 2401 East 6th Street, Suite 3037-201, Austin, Texas 78702. Defendant manufactures, markets, and sells the Products online, including through the at-issue Bloom, Amazon, Target, Walmart, and Kroger listings, and through retail stores in California and the United States.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action where the aggregate claims of all members of the proposed Classes are in excess of $5,000,000.00 exclusive of interest and costs, and Plaintiff, as well as most members of the proposed Classes, are citizens of states different from Defendant.

9. This Court has personal jurisdiction over Defendant because it conducts and transacts business in the State of California, including this District, thereby purposefully availing itself of the benefits of the forum. Furthermore, a substantial portion of the events giving rise to Plaintiff's claims also occurred in this District, including Plaintiff's purchase of the Product.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant conducts substantial business in this District and a substantial part of the events giving rise to Plaintiff's claims took place in this District.

## FACTUAL ALLEGATIONS

### A. Consumer Demand for Products Free of Artificial Preservatives

11. Clean label claims resonate with purchasers of food and beverage products and include "natural," "no artificial ingredients," and "no artificial preservatives." At least one survey found that "Americans are paying more attention to ingredient lists, choosing clean ingredients and avoiding chemical sounding ingredients," while about half of Americans say they are worried about health risks from artificial ingredients, chemicals, and/or preservatives in foods (rising to 79% of health-focused shoppers), and that 58% read product labels all or most of the time before purchasing a new item.[4]

12. In response to consumers' desire for products free of artificial preservatives, many companies, including Defendant, have scrambled to manufacture, market, and sell purportedly "clean label" products in an effort to gain market share. Rather than creating the preservative-free products consumers desire, Defendant has chosen to market the Products through deceptive advertising to convince consumers the Products contain no artificial preservatives when, in reality, they contain manufactured citric acid, an artificial ingredient that functions as a preservative.

13. In response to the material role preservatives play in consumers' purchasing decisions, the United States Food and Drug Administration ("FDA") has established rules governing chemical preservatives. As relevant here, the FDA defines a "chemical preservative" as

[4] Acosta Group, Half of U.S. Shoppers Worried About Artificial Ingredients (Feb. 24, 2026), https://www.acosta.group/half-of-u-s-shoppers-worried-about-artificial-ingredients/.

any chemical that, when added to food, tends to prevent or retard deterioration thereof, subject to specified exclusions. 21 C.F.R. § 101.22(a)(5).

14. Consumers also increasingly seek out and rely on terms like "no artificial preservatives" when making purchasing decisions about food and beverage products. The absence of artificial preservatives is material to consumers who wish to avoid artificial ingredients and purchase clean-label products.

15. Preservatives are among the ingredients consumers specifically seek to avoid in food and beverage products. The presence or absence of artificial preservatives is therefore material to reasonable consumers.

16. Defendant knows that "no artificial preservatives" claims command a price premium and attract consumers seeking clean-label products. Defendant applied the claim without formulating the Products to exclude artificial preservatives.

**B. The Products and Defendant's Representations**

17. Defendant manufactures, markets, and sells the Products throughout the United States, including in California, through its website, Amazon.com, Target.com, Walmart.com, Kroger.com, and retail stores. The Products are sold in nine variants: Shirley Temple, Classic Orange, Peach Pineapple, Raspberry Lemonade, Rocket Blast, Strawberry Cream, the Variety Pack advertised as the Classic Pack, Watermelon Lime, and Winter Pomberry.

18. As depicted below, Defendant prominently represents that the Products contain "No artificial flavors, colors, or preservatives."

***i. Defendant's Website.***

**Bloom Website — Shirley Temple**

Representative official product-page creative

**Representation and ingredient disclosure**




Source: https://bloomnu.com/products/bloom-pop?variant=45974034251876 (accessed August 24, 2026)

Source URLs.[5]

[5] Bloom product variants displaying the challenged representation in product-carousel imagery: Rocket Blast: https://bloomnu.com/products/bloom-pop?variant=48428895961188; Shirley Temple: https://bloomnu.com/products/bloom-pop?variant=45974034251876; Peach Pineapple: https://bloomnu.com/products/bloom-pop?variant=48051476430948; Strawberry Cream: https://bloomnu.com/products/bloom-pop?variant=45974034350180; Raspberry Lemonade: https://bloomnu.com/products/bloom-pop?variant=45974034317412; Watermelon Lime: https://bloomnu.com/products/bloom-pop?variant=45974034382948; Classic Orange: https://bloomnu.com/products/bloom-pop?variant=45974034284644; Winter Pomberry: https://bloomnu.com/products/bloom-pop?variant=48916121518180; Classic Pack: https://bloomnu.com/products/bloom-pop?variant=46836799897700 (last accessed August 24, 2026).

***ii. Amazon.com.***




Source URLs.[6]

[6] Amazon product listings displaying the challenged representation in carousel imagery and/or "About this item" content: Shirley Temple: https://www.amazon.com/dp/B0FJKN2F76?th=1; Classic Orange: https://www.amazon.com/dp/B0FJKDR5SB?th=1; Peach Pineapple: https://www.amazon.com/dp/B0GF4GHHCJ?th=1; Raspberry Lemonade: https://www.amazon.com/dp/B0FJK8PNJ3?th=1; Rocket Blast: https://www.amazon.com/dp/B0GVTVWRNT?th=1; Strawberry Cream: https://www.amazon.com/dp/B0FJJXCFPL?th=1; Variety Pack / Classic Pack: https://www.amazon.com/dp/B0FJKG8K8D?th=1; Watermelon Lime: https://www.amazon.com/dp/B0FJKFMRQ5?th=1; Winter Pomberry: https://www.amazon.com/dp/B0FYSHNJ4W?th=1 (last accessed August 17, 2026).

***iii. Target.com.***




Source URLs.[7]

[7] Target product listings displaying the challenged representation in both written "Highlights" and the carousel image: Rocket Blast (12 fl oz single can): https://www.target.com/p/bloom-nutrition-pop-rocket-blast-12floz/-/A-95228286; Shirley Temple (12 fl oz single can): https://www.target.com/p/bloom-pop-shirley-temple-soda-12-fl-oz-can/-/A-94788195; Raspberry Lemonade (12 fl oz single can): https://www.target.com/p/bloom-pop-raspberry-lemonade-sports-drink-12-fl-oz-can/-/A-94785583; Strawberry Cream (12 fl oz single can): https://www.target.com/p/bloom-pop-strawberry-cream-soda-12-fl-oz-can/-/A-94788192; Peach Pineapple (12 fl oz single can): https://www.target.com/p/bloom-nutrition-pop-peach-pineapple-12oz-single/-/A-95013388; Winter Pomberry (12 fl oz single can): https://www.target.com/p/bloom-pop-winter-pomberry-soda-12-fl-oz/-/A-94981404; Watermelon Lime (12 fl oz single can): https://www.target.com/p/bloom-pop-watermelon-lime-soda-12-fl-oz-can/-/A-94788198 (inventory preserved August 24, 2026).

***iv. Walmart.com.***




Source: https://www.walmart.com/ip/Bloom-Pop-Shirley-Temple-12oz/16007271473 (accessed August 24, 2026; sold and shipped by Walmart.com when captured)

Source URLs.[8]

---

[8] Walmart product listings displaying the challenged representation in written "Key item features": Shirley Temple; single 12 fl oz can: https://www.walmart.com/ip/Bloom-Pop-Shirley-Temple-12oz/16007271473; Strawberries & Cream; single 12 fl oz can: https://www.walmart.com/ip/Bloom-Pop-Strawberries-Cream-12oz/15982572433; Raspberry Lemon; single 12 fl oz can: https://www.walmart.com/ip/Bloom-Pop-Raspberry-Lemon-12oz/16024053637; Watermelon Lime; single 12 fl oz can: https://www.walmart.com/ip/Bloom-Pop-Watermelon-Lime-12oz/16024017734; Peach Pineapple; single 12 fl oz can: https://www.walmart.com/ip/Bloom-Pop-Peach-Pineapple-12oz-12pk/18069966983; Rocket Blast; single 12 fl oz can: https://www.walmart.com/ip/Bloom-Pop-Rocket-Blast-12oz/19685853964; Shirley Temple; 4 pack: https://www.walmart.com/ip/Bloom-Pop-4pk-Shirley-Temple/16024053636; Strawberries & Cream; 4 pack: https://www.walmart.com/ip/Bloom-Pop-4pk-Strawberries-Cream/16033954558; Raspberry Lemonade; 4 pack: https://www.walmart.com/ip/Bloom-Pop-4pk-Raspberry-Lemon/16038152840; Rocket Blast; 4 pack: https://www.walmart.com/ip/4-pack-Bloom-Nutrition-Pop-Prebiotic-Soda-Rocket-Blast-12-fl-oz-Can/20380011134; Raspberry Lemon; 12 pack: https://www.walmart.com/ip/12-pack-Bloom-Nutrition-Pop-Prebiotic-Soda-Raspberry-Lemon-12-fl-oz-Can/17792067979; Shirley Temple; 12 pack: https://www.walmart.com/ip/12-pack-Bloom-Nutrition-Pop-Prebiotic-Soda-Shirley-Temple-12-fl-oz-Can/17820404882; Peach Pineapple; 12 pack: https://www.walmart.com/ip/12-pack-Bloom-Pop-Prebiotic-Soda-Peach-Pineapple-12-fl-oz-Can/19571053220 (last accessed August 24, 2026).

*v. Kroger.com.*




Source URLs.[9]

19. Defendant has disseminated the Representations through multiple online channels through which it sells and markets the Products—on Defendant's website and in Amazon, Target,

[9] Kroger product listings displaying the challenged claim: Classic Orange (12 fl oz single can): https://www.kroger.com/p/bloom-pop-classic-orange-prebiotic-soda-can/0084259513833; Peach Pineapple (12 fl oz single can): https://www.kroger.com/p/bloom-pop-peach-pineapple-prebiotic-soda-can/0084259513851; Raspberry Lemonade (12 fl oz single can): https://www.kroger.com/p/bloom-pop-raspberry-lemonade-prebiotic-soda-can/0084259513841; Rocket Blast (12 fl oz single can): https://www.kroger.com/p/bloom-pop-rocket-blast-prebiotic-soda-can/0084259514128; Shirley Temple (12 fl oz single can): https://www.kroger.com/p/bloom-pop-shirley-temple-prebiotic-soda-can/0084259513829; Strawberry Cream (12 fl oz single can): https://www.kroger.com/p/bloom-pop-strawberry-cream-prebiotic-soda-can/0084259513837; Watermelon Lime (12 fl oz single can): https://www.kroger.com/p/bloom-pop-watermelon-lime-prebiotic-soda-can/0084259513844; Raspberry Lemonade (4 pk / 12 fl oz): https://www.kroger.com/p/bloom-pop-raspberry-lemonade-prebiotic-soda-cans/0084259513843; Shirley Temple (4 pk / 12 fl oz): https://www.kroger.com/p/bloom-pop-shirley-temple-prebiotic-soda-cans/0084259513832; Strawberry Cream (4 pk / 12 fl oz): https://www.kroger.com/p/bloom-pop-strawberry-cream-prebiotic-soda-cans/0084259513840 (last accessed August 24, 2026).

Walmart, and Kroger listings. Depending on the channel, the Representations appeared in carousel imagery, product highlights, "Key item features," "Product Details," and/or other product-description content. The Representations appeared across the Products' variants and were disseminated to consumers who viewed the Products' listings. As a result of this widespread dissemination, Plaintiff and the Class were exposed to, and reasonably relied upon, Defendant's Representations in deciding to purchase the Products.

20. Despite these Representations, the Products contain manufactured citric acid, an artificial ingredient that functions as a preservative, as set forth below.

**C. The Products' Ingredients**

21. The Products' ingredients include manufactured citric acid, an artificial ingredient that functions as a preservative. It is described below.

***i.* The Citric Acid in the Products Is Not Natural**

22. Defendant uses artificial manufactured citric acid in the Products.[10] Commercial food manufacturers use a synthetic form of citric acid that is derived from heavy chemical processing.[11] Commercially produced citric acid is manufactured using a type of black mold called *Aspergillus niger* which is modified to increase citric acid production.[12] Consumption of manufactured citric acid has been associated with adverse health events like joint pain with swelling and stiffness, muscular and stomach pain, as well as shortness of breath.[13] Defendant does not use natural citric acid extracted from fruit in the Products. This is because "[a]pproximately 99% of the world's production of [citric acid] is carried out using the fungus

[10] Iliana E. Sweis, et al., Potential role of the common food additive manufactured citric acid in eliciting significant inflammatory reactions contributing to serious disease states: A series of four case reports, TOXICOL REP. 5:808-812 (2018), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6097542/

[11] A. Hesham, Y. Mostafa & L. Al-Sharqi, Optimization of Citric Acid Production by Immobilized Cells of Novel Yeast Isolates, 48 MYCOBIOLOGY 122, 123 (2020), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7178817/

[12] *Id*; Pau Loke Show, et al., Overview of citric acid production from Aspergillus niger, FRONTIERS IN LIFE SCIENCE, 8:3, 271-283 (2015), available at https://www.tandfonline.com/doi/full/10.1080/21553769.2015.1033653

[13] Iliana E. Sweis, et al., Potential role of the common food additive manufactured citric acid in eliciting significant inflammatory reactions contributing to serious disease states: A series of four case reports, TOXICOL REP. 5:808-812 (2018), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6097542/

*Aspergillus niger* since 1919." *Id*. As explained by a study published in the *Toxicology Reports Journal*:

> Citric acid naturally exists in fruits and vegetables. However**, it is not the naturally occurring citric acid, but the manufactured citric acid (MCA) that is used extensively as a food and beverage additive**. Approximately 99% of the world's production of MCA is carried out using the fungus Aspergillus niger since 1919. *Aspergillus niger* is a known allergen. [14]

23. A technical evaluation report for citric acid compiled by the United States Department of Agriculture Marketing Services ("USDA AMS") further explains that it is not commercially feasible to use natural citric acid extracted from fruits:

> "Traditionally by extraction from citric juice, [is] no longer commercially available. It is now extract by fermentation of a carbohydrate substance (often molasses) by citric bacteria, *Asperillus niger* (a mold) or *Candida guilliermondii* (a yeast). Citric acid is recovered from the fermentation broth by a lime and sulfuric acid process in which the citric acid is first precipitated as a calcium salt and then reacidulated with sulfuric acid."[15]

24. When asked "Is this substance Natural or Synthetic?" USDA AMS reviewers state: "synthetic."[16]

25. The FDA has determined that manufactured citric acid is not natural; it is artificial. The FDA sent warning letters to Hirzel Canning Company and Oak Tree Farm Dairy, Inc., for similar violations, saying that the FDA's policy involving the use of the word natural means that nothing artificial or synthetic has been added to the product, and that a product that labels itself "100% Natural" or "All Natural" violates that policy if it contains citric acid, and that the presence of citric acid precludes the use of the term natural to describe the product.[17]

26. The FDA explains that "Solvent extraction process for citric acid" is accomplished via "recovery of citric acid from conventional *Aspergillus niger* fermentation liquor may be safely used to produce food-grade citric acid in accordance with the following conditions: (a) The solvent used in the process consists of mixture of n-octyl alcohol meeting the requirements of § 172.864 of this chapter, ***synthetic*** isoparaffinic petroleum hydrocarbons meeting the requirements of § 172.882 of this chapter, and tridodecyl amine." 21 C.F.R. § 173.280 (emphasis added). Chemical solvents such as n-octyl alcohol and synthetic

---

[14] *Id*. (emphasis added)

[15] **Exhibit A** at page 6.

[16] **Exhibit A** at pages 4-5.

[17] *See* **Exhibit B** at page 2 and **Exhibit C** at page 2.

isoparaffinic petroleum hydrocarbons are used to extract the citric acid that Defendant uses in the Products from *aspergillus niger* fermentation liquor. *See 21 C.F.R. § 173.280. The citric acid that Defendant uses in the Products is* produced through chemical solvent extraction and contains residues of those chemical solvents.

27. The *Toxicology Reports Journal* study explains that "the potential presence of impurities or fragments from the *Aspergillus niger* in [manufactured citric acid] is a significant difference that may trigger deleterious effects when ingested."[18] The study further explains:

> "Given the thermotolerance of A. niger, there is great potential that byproducts of A. niger remain in the final [manufactured citric acid] product. Furthermore, given the pro-inflammatory nature of A. niger even when heat-killed, repetitive ingestion of [manufactured citric acid] may trigger sensitivity or allergic reactions in susceptible individuals. Over the last two decades, there has been a significant rise in the incidence of food allergies." Id.

28. The EPA provides the following simple schematic of the manufacturing process for citric acid which includes the use of synthetic solvents like Sulfuric Acid.[19]




29. Dr. Ryan Monahan, a prominent functional medicine practitioner, notes that the "[p]resent

[18] Iliana E. Sweis, *et al., Potential role of the common food additive manufactured citric acid in eliciting significant inflammatory reactions contributing to serious disease states: A series of four case reports*, TOXICOL REP. 5:808-812 (2018), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6097542/

[19] https://www.epa.gov/system/files/documents/202303/Citric%20Acid%20Supply%20Chain%20Profile.pdf (last accessed March 13, 2026)

day process of creating manufactured citric acid involves feeding sugars derived from GMO corn to black mold, which then ferments to form manufactured citric acid."[20]

30. Dr. Monahan also notes that "*Aspergillus niger* is associated with systemic inflammatory issues, including respiratory, gastrointestinal, neurological and musculoskeletal. Due to the potential for fragments of *Aspergillus niger* to make their way into the finished product of manufactured citric acid, this toxic inflammatory substance is likely being ingested by consumers of Products containing citric acid. Even with high-heat processing to kill it, research has shown *Aspergillus niger* can still elicit an inflammatory response."[21]

31. Clinical nutritionist Serge Gregoire notes that "[f]ood manufacturers leave out that citric acid is derived from genetically modified black mold grown on GMO corn syrup" and that "[c]ompanies continuously capitalize on an ignorance-based market."[22] Gregoire states, "Citric acid production has become a refined and highly prized industrial process." Gregoire notes that the *Aspergillus niger* used to produce citric acid is engineered to increase production of citric acid which has "resulted in countless generations of genetically modified mutant variants, now specialized for industrial-scale economics."

32. "Further genetic modification in the lab has taken place through the engineering of the glycolytic pathway, resulting in a metabolic-streamlining that facilitates greater citric acid production from sugar while shutting off side avenues of glycolysis." *Id*.

33. "Mutagenesis has been used in recent years to improve the citric-acid producing strains so that they can be used in industrial applications. The most common methods include the use of mutagens to induce mutations on the parental strains. The mutagens utilized for improvements are gamma radiation, ultraviolet radiation and often chemical mutagens. For hyperproducer strains, a hybrid method that combines

---

[20] Dr. Ryan Monahan, *Citric Acid: A Common Food Additive With An Uncommon Source* (2024) *available at* https://www.peacefulmountainmedicine.com/post/citric-acid-a-common-food-additive-with-an-uncommon-source (Last accessed March 12, 2026)

[21] Dr. Ryan Monahan, *Citric Acid: A Common Food Additive With An Uncommon Source* (2024) *available* at https://www.peacefulmountainmedicine.com/post/citric-acid-a-common-food-additive-with-an-uncommon-source (last accessed March 12, 2026)

[22] Serge Gregoire, Avoid citric acid: a mold byproduct! (July 13, 2021) *available at* https://www.linkedin.com/pulse/avoid-citric-acid-mold-byproduct-serge-gregoire/

ultraviolet and chemical mutagens is used (Ratledge & Kristiansen Citation2001).”[23]

34. Below is a schematic representation of the metabolic reactions involved in citric acid production, the enzymes (italics), the known feedback loops (dashed lines) and their locations with the cellular structure of *Aspergillus niger*.[24]




35. Dictionary definitions define “artificial” as something made by man. For example, “artificial” is defined as “made by human skill; produced by humans…”[25] Merriam-Webster’s online

[23] Show, P. L., Oladele, K. O., Siew, Q. Y., Aziz Zakry, F. A., Lan, J. C. W., & Ling, T. C. (2015). Overview of citric acid production from Aspergillus niger. FRONTIERS IN LIFE SCIENCE, 8(3), 271–283, *available* at https://doi.org/10.1080/21553769.2015.1033653

[24] *Id*. at Figure 3.

[25] *Artificial*, DICTIONARY.COM, *available at* https://www.dictionary.com/browse/artificial

dictionary states that "artificial" means "humanly contrived …"[26] Cambridge Dictionary states that "artificial" means "made by people, often as a copy of something natural."[27]

36. Below are images of the chemical process used to create citric acid for use in food – a process that is visibly artificial:








37. Citric acid acts as an artificial flavoring and preserving agent when added to food products, including the Products at issue.[28] Citric acid has a sour, acidic, and slightly tart flavor. *Id*.

[26] *Artificial*, MERRIAM-WEBSTER'S DICTIONARY, *available at* https://www.merriam-webster.com/dictionary/artificial

[27] *Artificial*, CAMBRIDGE DICTIONARY, *available at* https://dictionary.cambridge.org/us/dictionary/english/artificial

[28]https://www.webstaurantstore.com/blog/3350/what-is-citric-acid.html#:~:text=What%20Is%20Sour%20Salt?,salt%20tastes%20sour%20and

38. The Food and Drug Administration ("FDA") defines a preservative as "any chemical that, when added to food, tends to prevent or retard deterioration thereof, but does not include common salt, sugars, vinegars, spices, or oils extracted from spices, substances added to food by direct exposure thereof to wood smoke, or chemicals applied for their insecticidal or herbicidal properties." 21 C.F.R. § 101.22(a)(5). The FDA has listed citric acid as a preservative in its "Overview of Food Ingredients, Additives and Colors" as shown below:[29]

| Types of Ingredients | What They Do | Examples of Uses | Names Found on Product Labels |
|---|---|---|---|
| **Preservatives** | Prevent food spoilage from bacteria, molds, fungi, or yeast (antimicrobials); slow or prevent changes in color, flavor, or texture and delay rancidity (antioxidants); maintain freshness | Fruit sauces and jellies, beverages, baked goods, cured meats, oils and margarines, cereals, dressings, snack foods, fruits and vegetables | Ascorbic acid, citric acid, sodium benzoate, calcium propionate, sodium erythorbate, sodium nitrite, calcium sorbate, potassium sorbate, BHA, BHT, EDTA, tocopherols (Vitamin E) |

39. In a warning letter sent to Chiquita Brands International, Inc. and Fresh Express, Inc., the FDA warned that certain products were misbranded under the Federal Food, Drug, and Cosmetic Act because they "contain the chemical preservatives ascorbic acid and citric acid but their labels fail to declare these preservatives with a description of their functions. 21 C.F.R. [§] 101.22" (emphasis added).[30]

40. The USDA's Food Safety Inspection Service's "Guideline for Label Approval" states that "common ***chemical*** preservatives include BHA, BHT, calcium propionate, citric acid, natamycin and sodium propionate."[31]

---

%20acidic. (last accessed March 12, 2026)

[29] *Overview of Food Ingredients Additives & Colors, Food and Drug Administration*, *available at* https://web.archive.org/web/20220901032454/http://www.fda.gov/food/foodingredients-packaging/overview-food-ingredients-additives-colors.

[30] *See* **Exhibit D** at page 2 (highlighted)

[31] FSIS Guideline for Label Approval, UNITED STATES DEPARTMENT OF AGRICULTURE, *available at* https://www.fsis.usda.gov/sites/default/files/media_file/documents/FSIS-GD-2023-0001.pdf (emphasis added)

**D. Defendant's Representations Are False and Misleading**

41. By the acts and conduct alleged herein, Defendant represents that the Products contain "No artificial flavors, colors, or preservatives." Those Representations are false or materially misleading.

42. The Representations indicate that the Products contain no artificial preservatives. That, however, is false because the Products contain manufactured citric acid, an artificial ingredient that functions as a preservative. Defendant compounds the misrepresentation by identifying citric acid in ingredient information while affirmatively representing that the Products contain no artificial preservatives. A reasonable consumer does not understand "no artificial preservatives" to include manufactured citric acid functioning as a preservative simply because citric acid can occur in nature.

43. A reasonable consumer is not expected to study the ingredient list or possess the specialized knowledge to determine that listed citric acid is industrially manufactured or functions as a preservative. The list does not clearly identify the artificial origin or preservative function of manufactured citric acid, and a reasonable consumer is not positioned to make those determinations at the point of sale. The foregoing deceptive acts and practices were directed at consumers and are misleading in a material way.

**E. Defendant's Labeling Violates Federal and California Food Labeling Law**

44. The federal Food, Drug, and Cosmetic Act ("FDCA") deems a food misbranded if "its labeling is false or misleading in any particular." 21 U.S.C. § 343(a)(1). The FDCA further deems a food misbranded if it bears or contains a chemical preservative unless its labeling states that fact. 21 U.S.C. § 343(k).

45. FDA regulations define "chemical preservative" to mean "any chemical that, when added to food, tends to prevent or retard deterioration thereof," subject to specified exclusions. 21 C.F.R. § 101.22(a)(5).

46. FDA regulations further require that a food to which a chemical preservative is added bear a label declaration stating both the common or usual name of the ingredient and a

separate description of its function, such as "preservative," "to retard spoilage," or "to help protect flavor." 21 C.F.R. § 101.22(j).

47. The Products identify citric acid in their ingredient information but do not separately describe its function as a preservative. Instead, Defendant affirmatively represents in the Products' online marketing that the Products contain no artificial preservatives.

48. Plaintiff's state-law claims are independently grounded in California's Sherman Food, Drug, and Cosmetic Law and the Unfair Competition Law, which parallel but do not depend on the FDCA. The FDCA provisions alleged above are offered as evidence of Defendant's conduct and as predicate unlawful acts supporting the UCL's unlawful prong—not as the sole basis for any state-law claim. Plaintiff's claims would exist under the Sherman Law and the UCL regardless of the FDCA, because California's food misbranding and false-advertising statutes impose obligations coextensive with, but independent from, those the FDCA imposes.

49. Defendant's marketing, advertising, and sale of the Products violate the misbranding provisions of the Sherman Law applicable to food (Cal. Health & Safety Code § 110660, et seq.), including but not limited to:

(a) Section 110660 (a food is misbranded if its labeling is false or misleading in any particular), in that Defendant represents that the Products contain no artificial preservatives when the Products contain manufactured citric acid, an artificial ingredient that functions as a preservative;

(b) Section 110680 (a food is misbranded if its labeling or packaging does not conform to the requirements of Chapter 4), in that the Products' labeling fails to conform to Chapter 4's prohibition on false and misleading advertising at Section 110390;

(c) Section 110705 (a food is misbranded if information required to appear on the label or labeling is not prominently placed with such conspicuousness as to render it likely to be read by the ordinary consumer), in that Defendant prominently represents that the Products contain no artificial preservatives while failing to state that manufactured citric acid functions as a preservative;

(d) Section 110740 (a food is misbranded if it bears or contains any artificial flavoring, artificial coloring, or chemical preservative unless its labeling states that fact), in that the Products contain manufactured citric acid functioning as a preservative while Defendant represents that the Products contain no artificial preservatives; and

(e) Sections 110760, 110765, and 110770 (it is unlawful to manufacture, sell, deliver, hold, or offer for sale misbranded food, to misbrand food, or to receive or deliver misbranded food in commerce), in that Defendant has manufactured, marketed, sold, and delivered the misbranded Products described herein.

50. Defendant's marketing, advertising, and sale of the Products also violate the false-advertising provisions of the Sherman Law (Cal. Health & Safety Code § 110390, et seq.), including but not limited to:

(a) Section 110390 (it is unlawful for any person to disseminate any false advertisement of any food), in that Defendant disseminated false and misleading advertising through its website and the Products' Amazon, Target, Walmart, and Kroger listings, representing that the Products contain no artificial preservatives;

(b) Section 110395 (it is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is falsely advertised), in that Defendant manufactured, sold, delivered, held, and offered the Products for sale through online and retail channels after disseminating the false advertising described herein; and

(c) Sections 110398 and 110400 (it is unlawful for any person to advertise any food that is adulterated or misbranded, and unlawful to receive in commerce any falsely advertised food or to deliver or proffer for delivery any such food), in that Defendant has advertised and continues to advertise the misbranded Products and has delivered and continues to proffer for delivery the falsely advertised Products to consumers.

**F. RULE 9(b) Allegations**

51. **WHO:** Defendant Bloom Nu LLC.

52. **WHAT:** Defendant's conduct was, and continues to be, false, deceptive, and misleading because Defendant affirmatively represented that the Products contain "No artificial

flavors, colors, or preservatives," while omitting and concealing that the Products contain manufactured citric acid, an artificial ingredient that functions as a preservative. These representations and omissions were material to Plaintiff and the Classes.

53. **WHEN:** Defendant made these material misrepresentations and omissions to Plaintiff and the members of the Classes throughout the Class Period, including immediately prior to and at the time of their purchases of the Products.

54. **WHERE:** On Defendant's website and in the Products' online listings on Amazon.com, Target.com, Walmart.com, and Kroger.com. Depending on the channel, the Representations appeared in carousel imagery, Amazon "About this item" content, Target "Highlights," Walmart "Key item features," Kroger "Product Details," and/or other product-description content.

55. **HOW:** By prominently making the Representations throughout its online marketing.

56. **INJURY:** Plaintiff and the members of the Classes purchased, and paid a premium for, the Products that they would not have purchased—or for which they would have paid substantially less—absent Defendant's misrepresentations and omissions.

**G. Plaintiff Lacks an Adequate Remedy at Law**

57. Plaintiff lacks an adequate remedy at law for the future harm described above. Damages cannot remedy Plaintiff's inability to rely on Defendant's Representations when deciding whether to purchase the Products in the future, and only injunctive relief requiring Defendant to cease the misleading Representations or reformulate the Products can address that prospective harm.

58. Equitable relief is also necessary because legal remedies may prove inadequate to provide complete relief, including restitution measured by the difference between the price Plaintiff and the Class paid and the value of the Products as received, and disgorgement of the revenues Defendant unfairly obtained, which are equitable remedies not necessarily coextensive with damages.

59. Equitable relief is also appropriate because the statutes of limitations for the causes of action pled herein vary. The UCL and FAL's statute of limitations are four years — one year longer than the CLRA's statute of limitations. Thus, class members who purchased the Products more than three years before the filing of the complaint would be barred from recovery if equitable relief were not permitted under the UCL and FAL.

60. The scope of actionable misconduct under the FAL and UCL is also broader than under the other causes of action asserted herein. The FAL and UCL prohibit Defendant's fraudulent marketing scheme. Plaintiff's warranty and common-law claims, on the other hand, are more limited, focusing on the specific duties and obligations arising from Defendant's misrepresentations and omissions at the point of purchase. The UCL also creates a cause of action for violations of laws that do not themselves provide for a private cause of action — including the FTC's prohibition on unfair and deceptive acts in the advertising of consumer products.

## CLASS ALLEGATIONS

61. Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3). The proposed classes are defined as (collectively, the "Classes"):

> ***Nationwide Class*:** All persons in the United States who, during the maximum period of time permitted by law, purchased Defendant's Products for their personal use.
> ***California Subclass*:** All persons in California who, during the maximum period of time permitted by the law, purchased Defendant's Products for their personal use.
>
> ***Multi-State Consumer Protection Subclass*:** All persons who, during the maximum period of time permitted by law, purchased Defendant's Products in the states enumerated in Count IV below.
>
> ***Multi-State Warranty Subclass*:** All persons who, during the maximum period of time permitted by law, purchased Defendant's Products in the states enumerated in Count V below.

62. The Classes do not include (1) Defendant, its officers, and/or directors; (2) the Judge and/or Magistrate to whom this case is assigned; (3) the Judge or Magistrate's staff and family; and (4) Plaintiff's counsel and Defendant's counsel.

63. Plaintiff reserves the right to amend the above class definitions and add additional classes and subclasses as appropriate based on investigation, discovery, and the specific theories of liability.

64. Numerosity: While the exact number of members of the Classes is unknown to Plaintiff at this time, and can only be determined by appropriate discovery, upon information and belief, members of the Classes number in the millions.

65. Existence and Predominance of Common Questions of Law and Fact: Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting only individuals of the Classes. These common questions include, but are not limited to:

(a) Whether the Products' Representations concerning their absence of artificial preservatives are false and misleading;

(b) Whether Defendant's Representations were material;

(c) Whether the Products contain manufactured citric acid;

(d) Whether the manufactured citric acid in the Products is artificial;

(e) Whether the manufactured citric acid in the Products functions as a preservative;

(f) Whether Defendant was unjustly enriched as a result of its unlawful conduct;

(g) Whether Plaintiff and the Classes have suffered damages and the amount thereof.

66. Typicality: The claims of the named Plaintiff are typical of the claims of other members of the Classes in that the named Plaintiff was exposed to Defendant's false and misleading Representations about the Products' absence of artificial preservatives, purchased a Product in reliance on those Representations, and suffered a loss as a result.

67. Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the Classes. Plaintiff has no interests adverse to the interests of the members of the Classes and is committed to the vigorous prosecution of this action, and, to that end, has retained skilled and experienced counsel.

68. ***Superiority*:** A class action is superior to all other available methods for the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure

23(b)(3) because the expense and burden of individual litigation makes it economically unfeasible for members of the Classes to seek redress other than through the procedure of a class action.

## CAUSES OF ACTION

### COUNT I
### Violation of California's Consumers Legal Remedies Act
### Cal. Civ. Code § 1750, *et seq.*
### (On Behalf of the California Subclass)

69. Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

70. Plaintiff brings this claim on behalf of herself and the California Subclass against Defendant.

71. Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have."

72. Civil Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

73. Civil Code § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

74. Defendant profited from the sale of the falsely, deceptively, and unlawfully advertised Products to unwary consumers by making the Representations even though the Products contain manufactured citric acid, an artificial ingredient that functions as a preservative.

75. Defendant's wrongful business practices constituted, and still constitute, a continuing course of conduct in violation of the CLRA.

76. On May 18, 2026, Plaintiff sent Defendant a pre-suit notice letter pursuant to Cal. Civ. Code § 1782. The letter was sent by certified mail, return receipt requested, provided notice of Defendant's violations of the CLRA, Cal. Civ. Code § 1750, et seq., the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790, et seq., and Cal. Com. Code §§ 2313–2314, and demanded that Defendant correct the unlawful, unfair, false, and deceptive practices alleged herein. Defendant

failed to remedy the violations identified in the letter within 30 days of receipt. Accordingly, Plaintiff seeks actual, statutory, and punitive damages, restitution, injunctive relief, and attorneys' fees and costs under the CLRA pursuant to Cal. Civ. Code §§ 1780(a) and 1782(d).

**COUNT II**
**Violation of California's Unfair Competition Law ("UCL")**
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(On Behalf of the California Subclass)**

77. Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this Complaint.

78. Plaintiff brings this claim individually and on behalf of the members of the California Subclass against Defendant.

79. Defendant violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200–17210, et seq., by engaging in unfair, fraudulent, and unlawful business practices.

80. The UCL prohibits unfair competition, defined to include "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. A business act or practice is "unlawful" if it violates any established state or federal law. A practice is unfair if it (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. The UCL allows "a person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL. Cal. Bus. & Prof. Code § 17204. Such a person may bring such an action on behalf of herself or others similarly situated who are affected by the unlawful and/or unfair business practice or act.

81. Defendant's acts, as described above, constitute unlawful, unfair, and fraudulent business practices pursuant to California Business & Professions Code §§ 17200, et seq.

82. Defendant violated the UCL's proscription against engaging in unlawful business practices through its violations of the FAL, Cal. Bus. & Prof. Code § 17500, et seq.; the CLRA, Cal. Civ. Code § 1770, et seq.; the Sherman Food, Drug, and Cosmetic Law, including without limitation Cal. Health & Safety Code §§ 110390, 110395, 110398, 110400, 110660, 110680,

110705, 110740, 110760, 110765, and 110770; and federal laws regulating the advertising and labeling of food, including 21 U.S.C. § 343(a)(1) and (k) and 21 C.F.R. § 101.22(a)(5) and (j), and Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

83. Defendant has also violated the UCL's proscription against engaging in fraudulent business practices by making the Representations.

84. Despite those Representations, however, the Products contain manufactured citric acid, an artificial ingredient that functions as a preservative, contradicting the Representations.

85. Defendant has also violated the UCL's proscription against engaging in unfair business practices. Defendant's acts, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of Business & Professions Code § 17200, et seq., in that Defendant's conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct. There is no utility to misrepresenting the true composition of the Products or the absence of artificial preservatives to the detriment of consumers. Furthermore, Defendant's false and misleading Representations are detrimental to other prebiotic soda manufacturers that either do not make similar claims, or if they do, they do not contradict them by adding artificial preservatives. As such, Defendant's misrepresentations and omissions hurt both consumers and the prebiotic soda market as a whole.

86. Plaintiff and the Classes suffered substantial injury by virtue of buying the Products that they would not have purchased absent Defendant's unlawful, fraudulent, and unfair marketing, advertising, and omissions about the inclusion of manufactured citric acid, an artificial ingredient that functions as a preservative.

87. The gravity of the consequences of Defendant's conduct as described above outweighs any justification, motive, or reason therefor, particularly considering the available legal alternatives which exist in the marketplace. Such conduct is immoral, unethical, unscrupulous,

offends established public policy, or is substantially injurious to Plaintiff and the other members of the Classes.

88. Plaintiff and the Classes could not have reasonably avoided their injury or known that the Products' prominent online marketing was, in fact, inaccurate and contradicted by ingredient information presented elsewhere in the listings. Furthermore, consumers do not possess the specialized knowledge to discern whether listed citric acid is naturally extracted or industrially manufactured, or whether it functions as a preservative. As such, they could not have reasonably avoided the injury they suffered.

89. Pursuant to California Business and Professions Code § 17203, Plaintiff and the California Subclass Members seek restitution, attorneys' fees, and all other relief that the Court deems proper.

**<u>COUNT III</u>**
**Violation of California's False Advertising Law**
**Cal. Bus. & Prof. Code § 17500, et seq.**
**(On Behalf of the California Subclass)**

90. Plaintiff hereby incorporates the foregoing allegations as if fully set forth herein.

91. Plaintiff brings this claim on behalf of herself and the California Subclass against Defendant.

92. Defendant's acts and practices, as described herein, have deceived and/or are likely to continue to deceive members of the California Subclass and the public. As described throughout this Complaint, Defendant represented that the Products contain " "No artificial flavors, colors, or preservatives."

93. Despite those representations, however, the Products contain manufactured citric acid, an artificial ingredient that functions as a preservative.

94. By its actions, Defendant has disseminated uniform advertising regarding the Products across California and the U.S. The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code § 17500, et seq. Such advertisements were intended to, and likely did, deceive the consuming public.

95. The above-described false, misleading, and deceptive advertising Defendant disseminated continues to have a likelihood to deceive in that Defendant affirmatively represented that the Products contain “No artificial flavors, colors, or preservatives.”

96. In making and disseminating these statements, Defendant knew, or should have known, that its advertising was untrue and misleading in violation of California law. Plaintiff and the members of the California Subclass based their purchasing decisions on Defendant’s materially false and misleading representations and warranties about the Products’ claimed absence of artificial preservatives. Plaintiff and the California Subclass were injured in fact and lost money and property as a result, in an amount to be proven at trial.

**COUNT IV**
**Violation of State Consumer Protection Statutes**
**(On Behalf of the Multi-State Consumer Protection Subclass)**

97. Plaintiff hereby incorporates the foregoing paragraphs as if fully stated herein.

98. Plaintiff brings this claim individually and on behalf of the Multi-State Consumer Protection Subclass against Defendant.[32]

99. Defendant’s acts and practices, as described herein, have deceived and/or are likely to continue to deceive members of the Multi-State Consumer Protection Subclass and the public.

[32] While discovery may alter the following, Plaintiff asserts that the states with similar consumer fraud laws under the facts of this case include but are not limited to: Alaska Stat. § 45.50.471, et seq.; Ariz. Rev. Stat. § 44-1521, et seq.; Ark. Code § 4-88-101, et seq.; Colo. Rev. Stat. Ann. § 6-1-101, et seq.; Conn. Gen. Stat. Ann. § 42-110a, et seq.; Del. Code Ann. tit. 6, § 2513, et seq.; D.C. Code § 28-3901, et seq.; Fla. Stat. Ann. § 501.201, et seq.; Haw. Rev. Stat. § 480-2, et seq.; Idaho Code Ann. § 48-601, et seq.; 815 ILCS 505/1, et seq.; Ind. Code § 24-5-0.5-2, et seq.; Kan. Stat. Ann. § 50-623, et seq.; Ky. Rev. Stat. Ann. § 367.110, et seq.; Me. Rev. Stat. Ann. tit. 5, § 207, et seq.; Md. Code Ann., Com. Law § 13-301, et seq.; Mass. Gen. Laws ch. 93A, § 1, et seq.; Mich. Comp. Laws Ann. § 445.901, et seq.; Minn. Stat. § 325F.68, et seq.; Mo. Rev. Stat. § 407.010, et seq.; Neb. Rev. Stat. § 59-1601, et seq.; Nev. Rev. Stat. § 41.600, et seq.; N.H. Rev. Stat. § 358-A:1, et seq.; N.J. Stat. Ann. § 56:8-1, et seq.; N.M. Stat. Ann. § 57-12-1, et seq.; N.Y. Gen. Bus. Law § 349, et seq.; N.C. Gen. Stat. § 75-1.1, et seq.; N.D. Cent. Code § 51-15-01, et seq.; Ohio Rev. Code Ann. § 1345.01, et seq.; Okla. Stat. tit. 15, § 751, et seq.; Or. Rev. Stat. § 646.605, et seq.; 73 Pa. Stat. Ann. § 201-1, et seq.; R.I. Gen. Laws § 6-13.1-1, et seq.; S.D. Codified Laws § 37-24-1, et seq.; Tex. Bus. & Com. Code Ann. § 17.41, et seq.; Utah Code Ann. § 13-11-4, et seq.; Vt. Stat. Ann. tit. 9, § 2451, et seq.; Va. Code Ann. § 59.1-196, et seq.; Wash. Rev. Code § 19.86.010, et seq.; W. Va. Code § 46A-1-101, et seq.; Wis. Stat. § 100.18, et seq.; and Wyo. Stat. Ann. § 40-12-101, et seq.

As described throughout this Complaint, Defendant represented that the Products contain "No artificial flavors, colors, or preservatives."

100. Despite those representations, however, the Products contain manufactured citric acid, an artificial ingredient that functions as a preservative.

101. The foregoing deceptive acts and practices were directed at consumers and are misleading in a material way because they fundamentally misrepresent the nature, composition, preservative content, and value of the Products.

102. Plaintiff and the Multi-State Consumer Protection Subclass seek to recover their actual damages, statutory damages, punitive damages, and reasonable attorneys' fees and costs.

**COUNT V**
**Breach of Express Warranty**
**(On Behalf of the Multi-State Warranty Subclass)**

103. Plaintiff hereby incorporates the foregoing paragraphs as if fully stated herein.

104. Plaintiff brings this claim individually and on behalf of the Multi-State Warranty Subclass against Defendant.[33]

105. Plaintiff and the Multi-State Warranty Subclass Members formed a contract with Defendant at the time they purchased the Products. In the alternative, no privity of contract is required because Plaintiff and the Multi-State Warranty Subclass Members relied on Defendant's written representations in Defendant's official online listings, which Defendant intended consumers to review and rely upon.

[33] While discovery may alter the following, Plaintiff asserts that the states with similar express warranty laws under the facts of this case include, but are not limited to: Alaska Stat. § 45.02.313; Ariz. Rev. Stat. § 47-2313; Ark. Code § 4-2-313; Cal. Com. Code § 2313; Colo. Rev. Stat. § 4-2-313; Conn. Gen. Stat. § 42a-2-313; Del. Code Ann. tit. 6, § 2-313; D.C. Code § 28:2-313; Fla. Stat. § 672.313; Ga. Code § 11-2-313; Haw. Rev. Stat. § 490:2-313; Idaho Code § 28-2-313; 810 ILCS 5/2-313; Ind. Code § 26-1-2-313; Kan. Stat. Ann. § 84-2-313; Ky. Rev. Stat. Ann. § 355.2-313; Me. Rev. Stat. tit. 11, § 2-313; Mass. Gen. Laws ch. 106, § 2-313; Minn. Stat. § 336.2-313; Miss. Code Ann. § 75-2-313; Mo. Rev. Stat. § 400.2-313; Mont. Code Ann. § 30-2-313; Neb. U.C.C. § 2-313; Nev. Rev. Stat. § 104.2313; N.H. Rev. Stat. Ann. § 382-A:2-313; N.J. Stat. Ann. § 12A:2-313; N.M. Stat. Ann. § 55-2-313; N.Y. U.C.C. Law § 2-313; N.C. Gen. Stat. § 25-2-313; N.D. Cent. Code § 41-02-30; Ohio Rev. Code Ann. § 1302.26; Okla. Stat. tit. 12A, § 2-313; Or. Rev. Stat. § 72.3130; 13 Pa. Cons. Stat. § 2313; R.I. Gen. Laws § 6A-2-313; S.C. Code Ann. § 36-2-313; S.D. Codified Laws § 57A-2-313; Tenn. Code Ann. § 47-2-313; Tex. Bus. & Com. Code § 2.313; Utah Code Ann. § 70A-2-313; Vt. Stat. Ann. tit. 9A, § 2-313; Va. Code Ann. § 8.2-313; Wash. Rev. Code Ann. § 62A.2-313; W. Va. Code § 46-2-313; Wis. Stat. § 402.313; and Wyo. Stat. Ann. § 34.1-2-313.

106. The terms of the contract include the Representations that the Products contain "No artificial flavors, colors, or preservatives."

107. These Representations constitute express warranties and became part of the basis of the bargain between Plaintiff and the Multi-State Warranty Subclass and Defendant.

108. As set forth above, Defendant breached its express warranties because the Products contain manufactured citric acid, an artificial ingredient that functions as a preservative.

109. Plaintiff provided Defendant with timely pre-suit notice of the breaches alleged herein.

110. Plaintiff and the Multi-State Warranty Subclass performed all conditions precedent to Defendant's liability when they purchased the Products.

111. Plaintiff and the members of the Multi-State Warranty Subclass would not have purchased the Products had they known the true nature of the Products.

112. As a result, Plaintiff and each member of the Multi-State Warranty Subclass suffered financial damage and injury and are entitled to all damages, costs, interest, and fees, including attorneys' fees, as allowed by law.

## COUNT VI
**Unjust Enrichment**
**(On Behalf of the Nationwide Class)**

113. Plaintiff hereby incorporates the foregoing paragraphs as if fully stated herein.

114. Plaintiff brings this claim individually and on behalf of the Nationwide Class against Defendant under California law or, in the alternative, under the laws of the states in which the Nationwide Class members purchased the Products.

115. To the extent required, Plaintiff asserts this cause of action in the alternative to legal claims, as permitted by Rule 8.

116. Plaintiff and the Class Members conferred a benefit on Defendant in the form of the purchase money Defendant received from their purchases of the Products.

117. Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and the Class Members' purchases of the Products, which retention is unjust and

inequitable because Defendant represented that the Products contained no artificial preservatives, when they contained manufactured citric acid, an artificial ingredient that functions as a preservative.

118. Plaintiff and the Class Members have suffered an injury in fact and have lost money as a result of Defendant's unlawful conduct, and are entitled to restitution and disgorgement of all profits Defendant unjustly retained.

**PRAYER FOR RELIEF**

119. WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant as follows:

(a) For an order certifying the Classes under Fed. R. Civ. P. 23 and naming Plaintiff as representative of the Classes, and Plaintiff's Counsel as Class Counsel;

(b) For an order declaring that Defendant's conduct violates each of the statutes referenced herein;

(c) For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(d) For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

(f) For an order of restitution and all other forms of equitable monetary relief;

(g) For injunctive relief as pleaded or as the Court may deem proper; and

(h) For an order awarding Plaintiff's and the Classes' reasonable attorneys' fees and expenses and costs of suit.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

Dated: August 26, 2026

Respectfully submitted,

**GUCOVSCHI LAW FIRM, PLLC.**

By: /s/ Adrian Gucovschi
Adrian Gucovschi (State Bar No. 360988)
Nathaniel Haim Sari (State Bar No. 362634)
165 Broadway, Fl. 23
New York, NY 10006

Telephone: (212) 884-4230
Facsimile: (212) 884-4230
E-Mail: adrian@gucovschilaw.com
nathaniel@gucovschilaw.com

*Attorneys for Plaintiff*

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, Adrian Gucovschi, declare as follows:

1. I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court. I am a partner at Gucovschi Law Firm, PLLC, counsel of record for Plaintiff Samin Sayareh in this action. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2. The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the transaction alleged in the Complaint occurred in this District.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct, and that this declaration was executed at Miami, Florida, on August 26, 2026.

*/s/ Adrian Gucovschi*
Adrian Gucovschi

# Exhibit A

SyN 5 allowed

# NOSB NATIONAL LIST
# FILE CHECKLIST

## PROCESSING

**MATERIAL NAME:** Citric Acid

**CATEGORY:** Synthetic Allowed    **Complete?:** 3/16

✓ NOSB Database Form

✓ References

✓ MSDS (or equivalent)

✓ FASP (FDA)

✓ Date file mailed out: 1/8/95

✓ TAP Reviews from: Steve Taylor
Steven Harper
Bob Durst

Supplemental Information:

Microbial form only ....
because of substrate might be
as product

MISSING INFORMATION: ______

Page 1

# NOSB/NATIONAL LIST COMMENT FORM/BALLOT

**Use this page to write down comments and questions regarding the data presented in the file of this National List material. Also record your planned opinion/vote to save time at the meeting on the National List.**

**Name of Material** Citric Acid

**Type of Use:** ____ **Crops;** ____ **Livestock;** ✓ **Processing**

**TAP Review by:**

1. Steve Taylor
2. Steven Harper
3. Bob Durst

**Comments/Questions:**

---

**My Opinion/Vote is:**

**Signature** ____________________ **Date** ____________

Page 2

1.

## USDA/TAP REVIEWER COMMENT FORM

**Use this page or an equivalent to write down comments and summarize your evaluation regarding the data presented in the file of this potential National List material. Attach additional sheets if you wish.**

**This file is due back to us within 30 days of:** Jan 7

**Name of Material:** Citric Acid

**Reviewer Name:** Steve Taylor

**Is this substance Natural or Synthetic? Explain (if appropriate)**

Natural

**Please comment on the accuracy of the information in the file:**

**This material should be added to the National List as:**

____ **Synthetic Allowed** ____ **Prohibited Natural**

**or,** ____ **This material does not belong on the National List because:**

**Are there any restrictions or limitations that should be placed on this material by use or application on the National List?**

Made by fermentation. Fermentation is natural but process does ~~any~~ involve use of other substances: substrates: corn syrup, sucrose ammonium bicarbonate

**Any additional comments or references?**

Need to find out more about process and processing aids to make determination.

**Signature** Steve Taylor **Date** 3-5-95

Page 3

∝.

# USDA/TAP REVIEWER COMMENT FORM

**Use this page or an equivalent to write down comments and summarize your evaluation regarding the data presented in the file of this potential National List material. Attach additional sheets if you wish.**

**This file is due back to us within 30 days of:** Jan 7

**Name of Material:** Citric Acid

**Reviewer Name:** Steven Harper

**Is this substance Natural or Synthetic? Explain (if appropriate)**

Synthetic

**Please comment on the accuracy of the information in the file:**

Good

**This material should be added to the National List as:**

_x_ **Synthetic Allowed** ____ **Prohibited Natural**

**or,** ____ **This material does not belong on the National List because:**

**Are there any restrictions or limitations that should be placed on this material by use or application on the National List?**

No.

**Any additional comments or references?**

**Signature** Steven Harper **Date** 3/10/95

Page 4

## USDA/TAP Reviewer
## Comment Form

Material: Citric acid

Reviewer: Bob Durst

---

Is this substance Natural or Synthetic? Explain (if appropriate)

It is a natural occurring substance that commercially goes through numerous chemical processes to get to it's final usable form. This processing would suggest that it be classified as synthetic.

Please comment on the accuracy of the information in the file:

The file is accurate.

This material should be added to the National List as:

__X__ Synthetic Allowed,

_____ Prohibited Natural, or

_____ This material does not belong on the National List because:

Are there any restriction or limitations that should be placed on this material by use or application on the National List?

Must be listed on the ingredient label if it used used.

Unless it is actually derived from a natural source the labeling must not indicate that it is a natural compound.

Any additional comments or references?

As with all synthetic inorganic salts, source must be food grade. In addition each lot should be analyzed for toxic element concentrations (mercury, lead, cadmium, arsenic, thallium and antimony) and a near zero tolerance adopted.

Since citrus juices are a high natural source of citric acid, it might be advisable to find a manufacturer that is willing to isolate citric acid from organically grown fruit in an organically acceptable manner, and get a natural citric acid.

Signature [signature] Date 3/4/95

Page 5

# NOSB Materials Database

4.

## Identification

| | | | |
|---|---|---|---|
| Common Name | **Citric Acid** | Chemical Name | B-hydroxy-tricarboxylic acid C6H8O7 |
| Other Names | Citric Acid, Anhydrous USP/FCC | | |
| Code #: CAS | 77-92-9 | Code #: Other | 21 CFR 182-1033 |
| N. L. Category | Synthetic Allowed | MSDS | ◉ yes ○ no |

## Chemistry

| | |
|---|---|
| Family | Aliphatic Acid |
| Composition | $C_6H_8O_7$ |
| Properties | Colorless, translucent crystals, (or) white granular to fine crystalline powder, odorless, strong acid taste. |
| How Made | Traditionally by extraction from citrus juice, no longer commercially available. It is now extracted by fermentation of a carbohydrate substrate (often molasses) by citric acid bacteria, *Aspergillus niger* (a mold) or *Candida guilliermondii* (a yeast). Citric acid is recovered from the fermentation broth by a lime and sulfuric acid process in which the citric acid is first precipitated as a calcium salt and then reacidulated with sulfuric acid. |

## Use/Action

| | |
|---|---|
| Type of Use | Processing |
| Specific Use(s) | Production of fruit products, juices, oils, fats etc. for pH control, flavor enhancer, flavoring agent or adjuvant, leavening agent, sequestrant, antioxidant, solvent, antimicrogial agent, surface-active agent |
| Action | Optimizes stability of frozen foods by enhancing the action of antioxidants and inactivating enzymes. Brings out flavor in carbonated beverages. Acts as a synergist for antioxidants employed in inhibiting rancidity in foods containg fats and oils. |
| Combinations | pure substance |

## Status

| | |
|---|---|
| OFPA | |
| N. L. Restriction | Currently considered synthetic by NOSB. |
| EPA, FDA, etc | FDA -GRAS |
| Directions | |
| Safety Guidelines | Eye irritant, dust may cause mild respiratory irritation. |
| State Differences | |
| Historical status | Always been allowed in organic processing and considered natural. |
| Internationl status | Allowed by IFOAM, EU and Codex. |

# NOSB Materials Database

5.

## OFPA Criteria

**2119(m)1: chemical interactions** **Not Applicable**

**2119(m)2: toxicity & persistence** **Not Applicable**

**2119(m)3: manufacture & disposal consequences**

Microbial fermentation --Clarification --Precipitation --Dissolution --Crystallization --Drying --Sifting --packaging. The NOSB judged that citric acid produced by natural fermentation of carbohydrate substrates and purified by the lime-sulfuric method is synthetic because the citric acid comes into contact with lime and sulfuric acid and because of the chemical change from citric acid to calcium citrate and then back to citric acid during purification.

Biomass residuals are usually recycled as animal feeds and for agriculture.

**2119(m)4: effect on human health**

Material has been affirmed as GRAS by FDA for use in foods. The amount of citrate added to foods by food processors is about 500 mg per person per day. This amount occurs naturally in 2 ounces of orange juice and does not constitute a significant addition to the total body load.

Long term oral over exposure may cause damage to tooth enamel. Considered an irritatant to eyes and respiratory system during manufacture and handling. Recommended use of eye and respiratory protection during handling. Oral LD50 (rat) 11,700 mg/kg; dermal (acute) tested on skin of rabbit 500mg/24 hr moderate; eye 750 mg/24hr severe. FDA tests show no effect on reproduction, teratogenicity or oncogenicity in rats.

**2119(m)5: agroecosystem biology** **Not Applicable**

**2119(m)6: alternatives to substance**

Lactic acid ( has some taste problems and not used in infant foods).
Vinegar (strange taste in some foods).
Citrus juices.

**2119(m)7: Is it compatible?**

Compatible

## References

1. FDA. 1977. Evaluation of the health aspects of citric acid, sodium citrate, potassium citrate, calcium citrate, ammonium citrate, triethyl citrate, isopropyl citrate, and stearyl citrate as food ingredients. SCOGS-84. Life Science Research Office, 9650 Rockville Pike, Bethesda, Maryland 20014.

2. Ag Partners of Davis, *Materials Report for Citric Acid*, 1995. Organic Trade Association, Greenfield, MA

6.

MSDS for CITRIC ACID, MONOHYDRATE Page 1

1 - PRODUCT IDENTIFICATION

PRODUCT NAME: CITRIC ACID, MONOHYDRATE
FORMULA: HOC(COOH)(CH2COOH)2 H2O FORMULA WT: 210.14
CAS NO.: 5949-29-1
COMMON SYNONYMS: 2-HYDROXY-1,2,3,PROPANE-TRICARBOXYLIC ACID, MONOHYDRATE
PRODUCT CODES: 0118,0120,0119,0110
EFFECTIVE: 12/01/86 REVISION #02

PRECAUTIONARY LABELLING
BAKER SAF-T-DATA(TM) SYSTEM
HEALTH - 0 NONE
FLAMMABILITY - 1 SLIGHT
REACTIVITY - 0 NONE
CONTACT - 1 SLIGHT
HAZARD RATINGS ARE 0 TO 4 (0 = NO HAZARD; 4 = EXTREME HAZARD).
LABORATORY PROTECTIVE EQUIPMENT: SAFETY GLASSES; LAB COAT

PRECAUTIONARY LABEL STATEMENTS
CAUTION
MAY CAUSE IRRITATION
DURING USE AVOID CONTACT WITH EYES, SKIN, CLOTHING. WASH THOROUGHLY AFTER HANDLING. WHEN NOT IN USE KEEP IN TIGHTLY CLOSED CONTAINER.
SAF-T-DATA(TM) STORAGE COLOR CODE: ORANGE (GENERAL STORAGE)

2 - HAZARDOUS COMPONENTS

| COMPONENT | % | CAS NO. |
|---|---|---|
| CITRIC ACID, MONOHYDRATE | | (5949-29-1 |

3 - PHYSICAL DATA

BOILING POINT: N/A VAPOR PRESSURE(MM HG): N/A
MELTING POINT: N/A VAPOR DENSITY(AIR=1): N/A
SPECIFIC GRAVITY: 1.54 EVAPORATION RATE: N/A
(H2O=1) (BUTYL ACETATE=1)
SOLUBILITY(H2O): APPRECIABLE (MORE THAN 10 %) % VOLATILES BY VOLUME: 0
APPEARANCE & ODOR: WHITE, ODORLESS POWDER.

4 - FIRE AND EXPLOSION HAZARD DATA

FLASH POINT (CLOSED CUP N/A
FLAMMABLE LIMITS: UPPER - N/A % LOWER - N/A %
FIRE EXTINGUISHING MEDIA
USE WATER SPRAY, CARBON DIOXIDE, DRY CHEMICAL OR ORDINARY FOAM.

SPECIAL FIRE-FIGHTING PROCEDURES
FIREFIGHTERS SHOULD WEAR PROPER PROTECTIVE EQUIPMENT AND SELF-CONTAINED BREATHING APPARATUS WITH FULL FACEPIECE OPERATED IN POSITIVE PRESSURE MODE.

Page 8

7.

TOXIC GASES PRODUCED: CARBON MONOXIDE, CARBON DIOXIDE

---

## 5 - HEALTH HAZARD DATA

---

TOXICITY TEST RESULTS AND SAFETY AND HEALTH EFFECTS ARE LISTED FOR THE ANHYDROUS PRODUCT.
TOXICITY: LD50 (ORAL-RAT)(G/KG) - 11.7
LD50 (IPR-RAT)(MG/KG) - 883
LD50 (SCU-RAT)(MG/KG) - 5500
LD50 (ORAL-MOUSE)(MG/KG) - 5040
CARCINOGENICITY: NTP: NO IARC: NO Z LIST: NO OSHA REG: NO
EFFECTS OF OVEREXPOSURE
DUST MAY IRRITATE NOSE AND THROAT.
DUST MAY CAUSE HEADACHE, COUGHING, DIZZINESS OR DIFFICULT BREATHING.
DUST MAY IRRITATE OR BURN MUCOUS MEMBRANES.
CONTACT WITH SKIN OR EYES MAY CAUSE IRRITATION.

TARGET ORGANS: EYES, SKIN
MEDICAL CONDITIONS GENERALLY AGGRAVATED BY EXPOSURE: NONE IDENTIFIED
ROUTES OF ENTRY: INHALATION, EYE CONTACT, SKIN CONTACT

EMERGENCY AND FIRST AID PROCEDURES
INGESTION: IF SWALLOWED AND THE PERSON IS CONSCIOUS, IMMEDIATELY GIVE LARGE AMOUNTS OF WATER. GET MEDICAL ATTENTION.
INHALATION: IF A PERSON BREATHES IN LARGE AMOUNTS, MOVE THE EXPOSED PERSON TO FRESH AIR. GET MEDICAL ATTENTION.
EYE CONTACT: IMMEDIATELY FLUSH WITH PLENTY OF WATER FOR AT LEAST 15 MINUTES. GET MEDICAL ATTENTION.
SKIN CONTACT: IMMEDIATELY WASH WITH PLENTY OF SOAP AND WATER FOR AT LEAST 15 MINUTES.

---

## 6 - REACTIVITY DATA

---

STABILITY: STABLE HAZARDOUS POLYMERIZATION: WILL NOT OCCUR
INCOMPATIBLES: STRONG BASES
DECOMPOSITION PRODUCTS: CARBON MONOXIDE, CARBON DIOXIDE

---

## 7 - SPILL AND DISPOSAL PROCEDURES

---

STEPS TO BE TAKEN IN THE EVENT OF A SPILL OR DISCHARGE
WEAR SUITABLE PROTECTIVE CLOTHING. CAREFULLY SWEEP UP AND REMOVE.
DISPOSAL PROCEDURE
DISPOSE IN ACCORDANCE WITH ALL APPLICABLE FEDERAL, STATE, AND LOCAL ENVIRONMENTAL REGULATIONS.

---

## 8 - PROTECTIVE EQUIPMENT

---

VENTILATION: USE ADEQUATE GENERAL OR LOCAL EXHAUST VENTILATION TO KEEP FUME OR DUST LEVELS AS LOW AS POSSIBLE.
RESPIRATORY PROTECTION: NONE REQUIRED WHERE ADEQUATE VENTILATION CONDITIONS EXIST. IF AIRBORNE CONCENTRATION IS HIGH, USE AN APPROPRIATE RESPIRATOR OR DUST MASK.
EYE/SKIN PROTECTION: SAFETY GLASSES WITH SIDESHIELDS, NITRILE GLOVES RECOMMENDED.

8.

9 - STORAGE AND HANDLING PRECAUTIONS

SAF-T-DATA(TM) STORAGE COLOR CODE: ORANGE (GENERAL STORAGE)
SPECIAL PRECAUTIONS
KEEP CONTAINER TIGHTLY CLOSED. SUITABLE FOR ANY GENERAL CHEMICAL STORAGE AREA.

10 - TRANSPORTATION DATA AND ADDITIONAL INFORMATION

DOMESTIC (D.O.T.)
PROPER SHIPPING NAME CHEMICALS, N.O.S. (NON-REGULATED)

INTERNATIONAL (I.M.O.)
PROPER SHIPPING NAME CHEMICALS, N.O.S. (NON-REGULATED)

Page 10

9.

05 MAY 94 PAGE 1

DOCNUM=1937

U.S. FOOD AND DRUG ADMINISTRATION
FOOD ADDITIVE SAFETY PROFILE

---

CITRIC ACID

| | | | | |
|---|---|---|---|---|
| CAS#: | 000077929 | HUMAN CONSUMPTION: | 90.5367 | MG/KG BW/DAY/PERSON |
| FASP#: | 1937 | MARKET DISAPPEARANCE: | 106833333.333LBS/YR | |
| TYPE: | ASP | MARKET SURVEY: | 87 | |
| NAS#: | 2306 | JECFA: | NL-C | |
| FEMA#: | 2306 | JECFA ADI: | | MG/KG BW/DAY/PERSON |
| GRAS#: | 3 | JECFA ESTABLISHED: | 1979 | |
| POTENTIAL BEVERAGE USE | | LAST UPDATE: | 931115 | |

FW: 192.12 DENSITY: LOGP:

STRUCTURE CATEGORIES: A6

COMPONENTS:

SYNONYMS:
CITRIC ACID, ANHYDROUS
2-HYDROXY-1,2,3-PROPANETRICARBOXYLIC ACID
HYDROXYTRICARBOXYLIC ACID, BETA-
1,2,3-PROPANETRICARBOXYLIC ACID, 2-HYDROXY-
ACIDE CITRIQUE

CHEMICAL FUNCTION: F

TECHNICAL EFFECT:
PH CONTROL AGENT
FLAVOR ENHANCER
FLAVORING AGENT OR ADJUVANT
LEAVENING AGENT
SEQUESTRANT
ANTIOXIDANT
SOLVENT OR VEHICLE
SURFACE-ACTIVE AGENT
ANTIMICROBIAL AGENT
ENZYME

CFR REG NUMBERS:

| | | |
|---|---|---|
| 173.165 | 172.755 | 182.6033 |
| 182.1033 | PART 133 | PART 146 |
| 161.190 | PART 169 | PART 150 |
| 155.130 | 145.145 | 131.111 |
| 131.112 | 131.136 | 131.144 |
| 131.138 | 131.146 | 146.187 |
| 150.161 | 150.141 | 166.40 |
| 169.115 | 169.140 | 169.150 |
| 173.160 | 173.280 | 145.131 |
| 166.110 | 184.1033 | |

MINIMUM TESTING LEVEL: 3

COMMENTS: STUDY 1-12 FROM SCOGS-84

---

BOX 4A: LOWEST EFFECT LEVEL OBSERVED IN ALL AVAILABLE RAT OR MOUSE STUDIES

STUDY: 4 COMPLETENESS: RANKING FACTOR: 1.938E-2
SPECIES: RAT LEL: 4670 MG/KG BW/DAY
EFFECTS: CHOLESTEROL DECREASE
GLUTAMIC-OXALOACETIC TRANSAMINASE (SGOT/AST) INCREASE
ORGAN WEIGHT DECREASE
CELLULAR ATROPHY
SITES: THYMUS
SPLEEN
COMMENTS: MALES ONLY
SLIGHT ATROPHY OF THYMUS AND SPLENIC FOLLICLES
DATA FROM SCOGS-84

---

Page 11

10.

05 MAY 94 PAGE 2

DOCNUM=1937

BOX 4C: LOWEST EFFECT LEVEL OBSERVED IN ALL AVAILABLE STUDIES

STUDY: 4 COMPLETENESS: RANKING FACTOR: 1.938E-2
SPECIES: RAT LEL: 4670 MG/KG BW/DAY
EFFECTS: CHOLESTEROL DECREASE
GLUTAMIC-OXALOACETIC TRANSAMINASE (SGOT/AST) INCREASE
ORGAN WEIGHT DECREASE
CELLULAR ATROPHY
SITES: THYMUS
SPLEEN
COMMENTS: MALES ONLY
SLIGHT ATROPHY OF THYMUS AND SPLENIC FOLLICLES
DATA FROM SCOGS-84

---

BOX 7: ACUTE TOXICITY INFORMATION

STUDY: 2 SOURCE: J TAKEDA RES LAB 30:25-31
SPECIES: RAT YEAR: 1971
LD50: 12000 MG/KG BW
COMMENTS:

STUDY: 1 SOURCE: J TAKEDA RES LAB 30:25-31
SPECIES: MOUSE YEAR: 1971
LD50: 5000 MG/KG BW
COMMENTS:

---

BOX 9: ORAL TOXICITY STUDIES (OTHER THAN ACUTE)

STUDY: 3 COMPLETENESS: SOURCE: REV PORT FARM 20:41-46
TYPE: SHORT TERM YEAR: 1970
SPECIES: RAT LEL: 200 MG/KG BW/DAY
DURATION: 9 DAYS HNEL:
EFFECTS: BODY WEIGHT DECREASE
SITES:
COMMENTS: INITIAL DECREASE IN WEIGHT DID NOT PERSIST
NOT USED FOR PRIORITY RANKING

STUDY: 4 COMPLETENESS: SOURCE: J TAKEDA RES LAB 30:25-31
TYPE: SHORT TERM YEAR: 1971
SPECIES: RAT LEL: 4670 MG/KG BW/DAY
DURATION: 42 DAYS HNEL: 2260 MG/KG BW/DAY
EFFECTS: CHOLESTEROL DECREASE
GLUTAMIC-OXALOACETIC TRANSAMINASE (SGOT/AST) INCREASE
ORGAN WEIGHT DECREASE
CELLULAR ATROPHY
SITES: THYMUS SPLEEN
COMMENTS: SLIGHT ATROPHY OF THYMUS AND SPLENIC FOLLICLES

STUDY: 5 COMPLETENESS: SOURCE: J AM PHARM ASSOC SCI ED 34:86-89
TYPE: SUBCHRONIC RODENT YEAR: 1945
SPECIES: RAT LEL: > MG/KG BW/DAY
DURATION: 90 DAYS HNEL: 600 MG/KG BW/DAY
EFFECTS: NO EFFECTS
SITES:
COMMENTS: BODY WEIGHT, BLOOD, HISTOPATH AND REPRODUCTION OBSERVED

STUDY: 6 COMPLETENESS: SOURCE: J AM PHARM ASSOC SCI ED 34:86-89
TYPE: SUBCHRONIC MAMMAL (NON-RODENT) YEAR: 1945
SPECIES: DOG LEL: > MG/KG BW/DAY
DURATION: 112 DAYS HNEL: 1380 MG/KG BW/DAY
EFFECTS: NO EFFECTS
SITES:
COMMENTS: NO BEHAVIORAL, BIOCHEMICAL OR HISTOPATHOLOGICAL ABNORMALITIES

STUDY: 10 COMPLETENESS: SOURCE: GRP 7T0195 3
TYPE: TERATOGENICITY YEAR: 1973
SPECIES: RAT LEL: > MG/KG BW/DAY

Page 12

11.

05 MAY 94 PAGE 3

DOCNUM=1937

DURATION: 10 DAYS HNEL: 295 MG/KG BW/DAY
EFFECTS: NO EFFECTS
SITES:
COMMENTS: ADMINISTERED DAY 6-15 OF GESTATION

STUDY: 9 COMPLETENESS: SOURCE: GRP 7T0195 3
TYPE: TERATOGENICITY YEAR: 1973
SPECIES: MOUSE LEL: > MG/KG BW/DAY
DURATION: 10 DAYS HNEL: 241 MG/KG BW/DAY
EFFECTS: NO EFFECTS
SITES:
COMMENTS: ADMINISTERED DAY 6-15 OF GESTATION

STUDY: 11 COMPLETENESS: SOURCE: GRP 7T0195 3
TYPE: TERATOGENICITY YEAR: 1973
SPECIES: HAMSTER LEL: > MG/KG BW/DAY
DURATION: 5 DAYS HNEL: 272 MG/KG BW/DAY
EFFECTS: NO EFFECTS
SITES:
COMMENTS: ADMINISTERED DAY 6-10 OF GESTATION

STUDY: 12 COMPLETENESS: SOURCE: GRP 7T0195 3
TYPE: TERATOGENICITY YEAR: 1973
SPECIES: RABBIT LEL: > MG/KG BW/DAY
DURATION: 13 DAYS HNEL: 425 MG/KG BW/DAY
EFFECTS: NO EFFECTS
SITES:
COMMENTS: ADMINISTERED DAY 6-18 OF GESTATION

STUDY: 8 COMPLETENESS: SOURCE: J AGRIC FOOD CHEM 5:759-760
TYPE: RAT ONCOGENICITY YEAR: 1957
SPECIES: RAT LEL: > MG/KG BW/DAY
DURATION: 728 DAYS HNEL: 2000 MG/KG BW/DAY
EFFECTS: NO EFFECTS
SITES:
COMMENTS: MALES ONLY

STUDY: 7 COMPLETENESS: SOURCE: VOEDING 17:137-148
TYPE: REPRODUCTION (3-GENERATION) YEAR: 1956
SPECIES: RAT LEL: > MG/KG BW/DAY
DURATION: HNEL: 800 MG/KG BW/DAY
EFFECTS: NO EFFECTS
SITES:
COMMENTS:

---

BOX 3: GENETIC TOXICITY STUDIES

STUDY: 15 COMPLETENESS: SOURCE:
TYPE: YEAR:
SPECIES: LEL: MG/KG BW/DAY
DURATION: HNEL:
EFFECTS:
CELLS:
COMMENTS:

---

Page 13

# Exhibit B

U.S. Department of Health & Human Services

U.S. Food & Drug Administration

Inspections, Compliance, Enforcement, and Criminal Investigations

Home Inspections, Compliance, Enforcement, and Criminal Investigations Enforcement Actions Warning Letters

**Hirzel Canning Company 29-Aug-01**

DEPARTMENT OF HEALTH AND HUMAN SERVICES

Food and Drug Administration
Cincinnati District Office
Central Region
6751 Steger Drive
Cincinnati, OH 45237-3097
Telephone: (513) 679-2700
FAX: (513) 679-2771

August 29, 2001
WARNING LETTER
CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Karl A. Hirzel, President
Hirzel Canning Company
411 Lemoyne Road
Northwood, Ohio 43619

Dear Mr. Hirzel:

During an inspection of you firm on June 13, 2001 our Investigator collected labels for canned tomato products manufactured by your firm. We have limited our review to three of your products, which we have determined to be sufficiently representative of the labeling efficiencies of your products. Our review of the labels collected for the products listed below show that they cause the products to be in violation of Section 403 of the Federal Food Drug , and Cosmetic Act (the Act) and Title 21, Code of Federal Regulations (CFR), Part 101- Food Labeling as follows:

Dei Fratelli CONCENTRATED/ITALIAN STYLE TOMATO PUREE No Salt Added (28 OZ. Cm)

The above product is misbranded within the meaning of Section 403 (a)(I) of the Act in that its labeling 1s false or misleading. The term "FRESH-PACKED" used on the principal display panel, which falsely implies that the finished product in the package is ?fresh," when in fact it has been thermally processed. The Food and drug Administration (FDA) would not object to the use of the term "fresh" in the context of a statement such as "packed from lies tomatoes," provided that the tomatoes were indeed fresh as defined in 1 CFR 101.95 when they were added to the product.

Dei Fratelli Fresh & Read CHOPPED TOMATOES ONION & GARLIC (14.5 oz. cans) and Dei ratelli Fresh & Ready CHOPPED MEXICAN TOMATOES & JALAPENOS (14.5 oz. cans)

The above products are misbranded within the meaning of Section 403 a)(1) of the Act in that their labeling is false or misleading. The statements "FRESH- PACKED" on the principal display panel and "Fresh & Ready" in the brand name of the products falsely imply that the finished products in the package are "fresh," when in fact the have been thermally processed. In addition, according to the ingredient statements, the products contain at east two preservatives. Products that have been thermally processed or that contain preservatives do not meet the definition of "fresh." As stated above, FDA does not object to the use of the term "fresh" in the context of a statement such as "packed from fresh tomatoes," provided that the tomatoes were indeed fresh as defined in 1 CFR 101.95 when they were added to the product.

The Dei Fratelli ® ***. CHOPPED MEXICAN TOMATOES & JALAPENOS product is also misbranded under section 403 (r)((I )(A) of the Act because the label bears the nutrient content claim "HEALTHY," but does not meet the requirements for the claim, as defined in 21 CFR 101.65 (d). Based on the information m the nutrition label, the CHOPPED MEXICAN TOMATOES & JALAPENOS product contains 590 mg of sodium. A "healthy" claim may be used where, among other thing, the product contains no more than 360 mg of sodium.

Furthermore, the Dei Fratelli ® *** CONCENTRATED/ITALIAN STYLE TOMATO PUREE, CHOPPED TOMATOES ONIONS & GARLIC and CHOPPED MEXICAN TOMATOES & JALAPENOS products are misbranded under section 403(r)(I)(A) of the Act because the labels bear nutrient content claims that are not authorize by regulation for the Act or are not consistent with an authorizing regulation. The claims include "*** *a great source of Vitamins A and C, and the nutrient Lycopene." In the context used on these labels, the term "great source" is considered to be an unauthorized synonym for "high." FDA has define the nutrient content claim "high" in 21 CFR 101.54(b). ?High" can be used on a food label provided the food contains 20 percent or more of the Reference Daily Intake (RDI) or Daily Reference Value (DRV) per reference amount customarily consumed.

There is no established reference value for Lycopene; therefore, the claim "*** great source of *** Lycopene" is not authorized. In addition, the Dei Fratelli ® *** CONCENTRATE/ITALIAN STYLE TOMATO PUREE does not contain 20% or more of the RDI of vitamin A and the CHOPPED MEXICAN TOMATOES & JALAPENOS does not contain 20% or more of the RDIs for Vitamin A or C.

Some of the labels for your tomato products have a "NO SALT ADDED" statement on products that are not sodium free. However, the required statement, "not a sodium free food" or "not for control of sodium in the diet" does not appear on the information panel of the labels.

We request that you take prompt action to correct these violations. Failure to achieve prompt corrections may result m enforcement action such as seizure and/or injunction being initiated by FDA without further notice.

The above violations are not meant to be an all-inclusive list of deficiencies on your labels. Other label violations can subject your food products to legal action. It is your responsibility to assure that all of your products are labeled in compliance with all applicable statutes enforced by FDA.

You should also be aware that the term "fresh" in the ingredient name "FRESH TOMATOES" should not appear in the ingredient statement as part of the common or usual name of an ingredient. Ingredients must be declared b their common or usual & name, as stated in section 403(I)(2) of the Act and 21 CFR 101.4(a)(I). Optional information, such as the term "fresh? is not permitted.

Also, the Dei Fratelli ® *** CHOPPED TOMATOES ONIONS & GARLIC and CHOPPED MEXICAN TOMATOES & JALAPENOS labels bear the term "All NATURAL," but according to the ingredient statements, calcium chloride and citric acid are added to the products. We have not established a regulatory definition for the term "natural," however; we discussed its use in the ream le to the food labeling final regulations (58 Federal Register 2407, January 6, 1993). FDA?s policy regarding the use "natural", means that nothing artificial or synthetic as been included m, or as been added to, a food that would not normally be expected to be in the food. Therefore, the addition of calcium chloride and citric acid to these products preclude use of the term "natural" to describe this product.

Please advise us in writing within fifteen(15) working days of receipt of this letter of the specific actions you have taken to correct the violations along with copies of the revised labels. If corrective action cannot be completed within 15 days, state the reason for the delay and the time within which corrections will be completed.

Your reply should be sent to the Food and Drug Administration, 6751 Steger Drive, Cincinnati, Ohio 45237 to the attention of Evelyn D. Forney, Compliance Officer.

Sincerely,
Henry Fielden
District Director
Cincinnati District

Links on this page:

- Accessibility
- Contact FDA
- Careers
- FDA Basics
- FOIA
- No Fear Act
- Site Map
- Transparency
- Website Policies

U.S. Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
Ph. 1-888-INFO-FDA (1-888-463-6332)
Email FDA

- For Government
- For Press

- Combination Products
- Advisory Committees
- Science & Research
- Regulatory Information
- Safety
- Emergency Preparedness
- International Programs
- News & Events
- Training and Continuing Education
- Inspections/Compliance
- State & Local Officials
- Consumers
- Industry
- Health Professionals

U.S Department of Health & Human Services

Links on this page:

# Exhibit C

U.S. Department of Health & Human Services

U.S. Food & Drug Administration

## Inspections, Compliance, Enforcement, and Criminal Investigations

Home Inspections, Compliance, Enforcement, and Criminal Investigations Enforcement Actions Warning Letters

### Oak Tree Farm Dairy, Inc. 16-Aug-01

DEPARTMENT OF HEALTH & HUMAN SERVICES
Public Health Service

Food & Drug Administration
New York District
158-15 Liberty Avenue
Jamaica, NY 11433

WARNING LETTER
CERTIFIED MAIL
RETURN RECEIPT REQUESTED
August 16, 2001
Ref: NYK-2001-113

Richard Classey
Vice President and General Manager
Oak Tree Farm Dairy, Inc.
544 Elwood Road
East Northport, NY 11731

Dear Mr. Classey:

On May 17 and June 5 and 7,2001, we inspected your beverage manufacturing facility located at the above address. During the inspection, we collected a sample of your "OAKTREE REAL BREWED ICED TEA" product and labels for your "OAKTREE FRUIT PUNCH" and "OAKTREE ALL NATURAL LEMONADE" products. Our analysis of the iced tea and review of the labels found serious violations of the Federal Food, Drug, and Cosmetic Act ("the Act") and Title 21, Code of Federal Regulations, Part 101 - ,Food Labeling(21 CFR 101).

The "OAKTREE REAL BREWED ICED TEA" is misbranded under Section 403(i)(2) of the Act in that it contains the color additive "FD&C Red No. 40", but the certified color additive fails to be declared on the product label in the statement of ingredients by its specific name, as required (21 CFR 101.22(k)(1)). The product is also misbranded under Section 403(k) of the Act because it contains an artificial coloring that is not declared on the label.

The "OAKTREE FRUIT PUNCH" is misbranded under Section 403(k) of the Act because it contains sodium benzoate and potassium sorbate, which are not declared on the product label. A food to which a chemical preservative is added must declare the common or usual name of that ingredient and a description of its function, e.g., "preservative", as required by 21 CFR 101.226).

The above violations concern certain new labeling requirements and are not meant to be an all-inclusive list of deficiencies on your product labels. Other label violations can subject the foods to legal action. It is your responsibility to assure that all of your products are labeled in compliance with all applicable statutes enforced by the Food and Drug Administration ("FDA").

You should take prompt action to correct the violations. Failure to promptly correct these violations may result in regulatory action without further notice. These include seizure and/or injunction.

As you know, during the inspection, our investigator also reviewed the labels and formulations for your "OAKTREE ALL NATURAL LEMONADE" and "OAKTREE FRUIT PUNCH". Your lemonade label fails to declare the ingredient, citric acid, which is declared as an ingredient on the label of the lemonade concentrate used to make your lemonade. Further, your fruit punch label fails to declare the ingredients, grape juice, artificial fruit punch flavor, propylene glycol, sodium benzoate, and potassium sorbate, which are declared as ingredients on the label of the fruit punch concentrate used to make your fruit punch. Also, your fruit punch label declares the ingredients, concentrated pineapple juice, gum arabic, glycerol ester of wood resin, and blue 1.

However, these ingredients are not found in the fruit punch concentrate used to make your fruit punch and are not listed as ingredients in your fruit punch formulation. The investigator discussed these labeling discrepancies with you at the conclusion of the inspection.

The term "all natural" on the "OAKTREE ALL NATURAL LEMONADE" label is inappropriate because the product contains potassium sorbate. Although FDA has not established a regulatory definition for "natural," we discussed its use in the preamble to the food labeling final regulations (58 Federal Register 2407, January 6, 1993, copy enclosed). FDA?s policy regarding the use of "natural," means nothing artificial or synthetic has been included in, or has been added to, a food that would not normally be expected to be in the food. The same comment applies to use of the terms" 100 % NATURAL" and "ALL NATURAL" on the "OAKTREE REAL BREWED ICED TEA" label because it contains citric acid.

Further, the declaration of potassium sorbate in the ingredient statement on the "OAKTREE ALL NATURAL LEMONADE" label must be followed by a description of its function, e.g., "preservative", as required by 21 CFR 101.22(j).

You should notify this office in writing, within 15 working days of receipt of this letter of the specific steps you have taken to correct the noted violations. If corrective action cannot be completed within 15 days, state the reasons for the delay and the time within which the corrections will be completed.

Your reply should be directed to Bruce A. Goldwitz, Compliance Officer, Food and Drug Administration, 158-15 Liberty Avenue, Jamaica, New York 11433. If you have any questions concerning the violations noted, please contact Mr. Goldwitz at (718) 340-7000 ext. 5582.

Sincerely,

/s/
Robert L. Hart
Acting District Director

---

Links on this page:

- Accessibility
- Contact FDA
- Careers
- FDA Basics
- FOIA
- No Fear Act
- Site Map
- Transparency
- Website Policies

U.S. Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
Ph. 1-888-INFO-FDA (1-888-463-6332)
Email FDA

- USA.gov
-
-
-
-
-
-

- For Government
- For Press

- Combination Products
- Advisory Committees
- Science & Research
- Regulatory Information
- Safety
- Emergency Preparedness
- International Programs
- News & Events
- Training and Continuing Education
- Inspections/Compliance
- State & Local Officials
- Consumers
- Industry
- Health Professionals

U.S Department of Health & Human Services

---

Links on this page:

# Exhibit D

**Archived Content**

The content on this page is provided for reference purposes only. This content has not been altered or updated since it was archived.

Search Archive



## Inspections, Compliance, Enforcement, and Criminal Investigations

### Fresh Express Incorporated 10/6/10

Department of Health and Human Services

Public Health Service
Food and Drug Administration
San Francisco District
1431 Harbor Bay Parkway
Alameda. CA 94502-7070
Telephone: 510/337-6700

**WARNING LETTER**

**Via UPS**

October 6, 2010

Fernando Aguirre, President and CEO
Chiquita Brands International, Inc. and Fresh Express, Incorporated
250 East Fifth Street
Cincinnati, OR 45202

Dear Mr. Aguirre:

Starting on May 21, 2010 and ending on June 10, 2010, the Food and Drug Administration (FDA) inspected your food manufacturing facility located at 900 E. Blanco Road, Salinas, California. During this inspection, FDA investigators collected labels for your products and reviewed their labeling at http://www.chiquita.com[1]. Based on our review, we have concluded that your Chiquita brand "Pineapple Bites with Coconut" and "Pineapple Bites" products are misbranded in violation of the Federal Food, Drug, and Cosmetic Act (the Act) and the applicable regulations in Title 21, Code of Federal Regulations, Part 101 (21 CFR 101). You can find the Act and FDA regulations through links at FDA's Internet home page at http://www.fda.gov[2].

Specifically, your "Pineapple Bites with Coconut" product is misbranded within the meaning of Section 403(a) of the Act [21 U.S.C. § 343(a)] in that its statement of identity, "Pineapple Bites with Coconut", is false and misleading. The ingredient statement for this product states that it is made with coconut; however, our investigation determined that this product is made with a coconut flavor spray. The characterizing flavor of your Pineapple with Coconut product must be identified in accordance with 21 CFR 101.22(i)(1)(iii) (for example. "coconut flavor").

Your "Pineapple Bites" and "Pineapple Bites with Coconut" products are misbranded within the meaning of Section 403(r)(1)(A) of the Act [21 U.S.C. § 343(r)(1)(A)] because their labeling bears nutrient content claims but the products do not meet the requirements for the claims.
Specifically, their labeling includes the claim "Plus ... Antioxidants." However, this claim does not include the names of the nutrients that are the subject of the claim or, alternatively, link the term "antioxidants" by a symbol (e.g., an asterisk) that refers to the same symbol that appears elsewhere on the same panel of the product label, followed by the name or names of the nutrients with recognized antioxidant activity. 21 CFR 101.54(g)(4). Your use of this antioxidant claim therefore misbrands your products under section 403(r)(2)(A)(I) of the Act [21 U.S.C. § 343(r)(2)(A)(i)].

Your "Pineapple Bites" and "Pineapple Bites with Coconut" products also bear the claim "Plus Phytonutrients." "Phytonutrients" are not nutrients for which a recommended daily intake (RDI) or daily recommended value (DRV) has been established. Therefore, nutrient content claims regarding "phytonutrients" are not authorized and further misbrand your products under section 403(r)(2)(A)(i) of the Act [21 U.S.C. § 343(r)(2)(A)(i)]. To the extent phytonutrients are intended to be the basis for an antioxidant nutrient content claim, that use would violate FDA regulations for the same reason and because phytonutrients are not recognized as having antioxidant activity. 21 CFR 101.54(g)(1) and (2).

Both your "Pineapple Bites" and "Pineapple Bites with Coconut" products also bear the statement "Only 40 Calories." This statement implies that the products are "low calorie" foods. A "low calorie" claim may be made if a food with a reference amount customarily consumed (RACC) greater than 30 grams (g) or greater than 2 tablespoons does not provide more than 40 calories per RACC. 21 CFR 101.60(b)(2)(i)(A). The RACC established for pineapple is 140 g. See 21 CFR 101.12(b) (Table 2, Fruits and Fruit Juices, All other fruits fresh, canned, or frozen).
The nutrition information for both products states that there are 40 calories per 1 piece (80 g) of product; this equals about 70 calories per RACC. Therefore, under 21 CFR 101.13(i)(2), the products are required t carry a disclaimer adjacent to the claim, e.g., "Only 40 calories per serving, not a low calorie food". Because your products fail to bear the required disclaimer, they are misbranded within the meaning of section 403(r)(1)(A) of the Act.

The "Pineapple Bites" and "Pineapple Bites with Coconut" products are further misbranded within the meaning of section 403(k) of the Act [21 U.S.C. 343(k)] in that they contain the chemical preservatives ascorbic acid and citric acid but their labels fail to declare these preservatives with a description of their functions. 21 CFR 101.22. Further, the ingredients ascorbic acid and citric acid must be declared by their common or usual names. 21 CFR 101.4(a).

This letter is not intended to be an all-inclusive review of your firm's products and processes. It is your responsibility to ensure that your firm and your products comply with the Act and FDA, regulations. You should take prompt action to correct the violations. Failure to promptly correct these violations may resul in regulatory action without further notice. For instance, we may take further action to seize your product or enjoin your firm from operating.

We also note that, FDA (through its contractor) obtained two samples of Fresh Express Hearts of Romaine the testing of which yielded human pathogens. One sample was found to contain *Salmonella Anatum*; another sample was found to contain *E. coli 0157:H7*. We acknowledge that you issued letters to your customers in an effort to recall affected products. However, FDA recommends that you review your firm's criteria for receipt of raw product, your procedures for ensuring that wash, flume and processing water dc not contaminate your products and any other conditions and practices that may relate to the cause of the contamination.

We further acknowledge your June 25, 2010 response to the Good Manufacturing Practices violations cited in the FDA Form 483 regarding this inspection. In your response, you committed to:

- Retrain employees to replace or sanitize their gloves after contacting unsanitized surfaces;
- Include the dryer hoist controls and the equipment control panels that involve direct employee contact in your daily wash and sanitation procedures;
- Create a new storage system for aprons, gloves, and sleeve guards for times during manufacturing when they are not in use; and
- Modify your cutting surface inspection and replacement program so that cutting surfaces will be changed after every **(b)(4)** of use.

However, you did not provide documentation to demonstrate that these corrections have been made. You also did not address the observation that your technician improperly read the free chlorine indicator tests in the flume water. Please provide this information and documentation in your response to this Warning Letter.

In addition to the labeling issues identified above, we note that the available labeling space is at least 6" in height; therefore, the size of the nutrition information declared on these packages is not appropriate and does not meet the formatting requirements under 21 CFR 101.9(d), including hairline and footnote requirements. We note that since some of the nutrients are at insignificant levels, a shortened version of the Nutrition Facts panel may be used, e.g., the statement "Not a significant source of dietary fiber", at the bottom of the table of nutrient values as allowed under 21 CFR 101.9(c).

Please notify this office in writing within fifteen (15) working days from the date you receive this letter of

the specific steps you have taken to correct the noted violations, including an explanation of how you plan to prevent these violations, or similar violations, from occurring again. Please include documentation of the corrective actions you have taken. If your planned corrections will occur over time, please include a timetable for implementation of those corrections. If corrective action cannot be completed within 15 working days, state the reason for the delay and the time within which the corrections will be completed.

Your response should be sent to:

Darlene B. Almogela
Director of Compliance
United States Food and Drug Administration
1431 Harbor Bay Parkway
Alameda, CA 94502

If you have any questions about the content of this letter please contact Sergio Chavez, Compliance Officer, at 510-337-6886.

/s/

Barbara Cassens
District Director

Page Last Updated: 10/08/2010
Note: If you need help accessing information in different file formats, see Instructions for Downloading Viewers and Players.

Accessibility Contact FDA Careers FDA Basics FOIA No Fear Act Site Map Transparency Website Policies

U.S. Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
Ph. 1-888-INFO-FDA (1-888-463-6332)
Email FDA

USA.gov

For Government For Press

Combination Products Advisory Committees Science & Research Regulatory Information Safety Emergency Preparedness International Programs News & Events Training and Continuing Education Inspections/Compliance State & Local Officials Consumers Industry Health Professionals FDA Archive

U.S. Department of Health & Human Services

**Links on this page:**

1. http://www.chiquita.com/
2. http://www.fda.gov